## 27895. WILBURN v. THE STATE.

UNDERCOFLER, Justice. Herman Franklin Wilburn was indicted and convicted of the murder of Bonnie Skinner (also known as Mrs. Herman Franklin Wilburn) by shooting her with a pistol. He was sentenced to life imprisonment.

The evidence shows that the defendant and the deceased had lived together as man and wife at the home of his father for about a year; that his father and his 17-year-old brother Jack also lived in the home. On the night of September 8, 1972, the defendant, the deceased and Jack went to a movie in the deceased's car. About 11:00 p.m., they brought Jack back to the home and the defendant and the deceased went for a ride. Jack never saw the deceased again but about 3:15 o'clock the next morning the defendant returned to the home alone. He gave Jack his .38 caliber Smith & Wesson pistol and asked him to wipe the deceased's fingerprints off it. Jack unloaded the pistol, wiped the fingerprints and blood from it, and laid it on the tank in the lavatory. At the request of the defendant, Jack also wiped some blood out of the seat of the car. Jack and the defendant then went in the car to look for their father. The defendant told Jack that the deceased was trying to shoot him, and that he just twisted the gun

around, that it discharged, and that he then threw her body in the Chattahoochee River at Rogers Bridge. While they were riding, the defendant was drinking liquor and when he went to sleep, Jack turned the car around and came back to their home about 7:00 a.m. The father was home at that time and Jack reported the facts to him. The defendant was drunk and asleep in the car at that time and had the pistol stuck in his belt. The father took the pistol and later gave it to the police officers. Jack and his father went to Rogers Bridge and found fresh bloodstains on the bridge. Jack went to get the police.

About 2:00 o'clock on the morning of the homicide, the defendant went to the home of a friend and told him that he had been to the river, that he and the deceased had had an argument about her talking with a truck driver, that the deceased had "pointed a gun at him and he started to wring it out of her hand and the gun went off." The defendant had blood on his hands and some on his shirt. He washed his hands at his friend's house and stayed there about an hour.

The police officers who were summoned arrived at the defendant's home about 7:30 a.m. and found the defendant sleeping in the front seat of the car; there was blood on the dash inside the car; the officers awakened the defendant and asked him where Bonnie Skinner was and he said he did not know. He stated that he did not know "where the bloodstains came from." The defendant was not then placed under arrest nor were his movements restricted. The defendant got out of the car, was walking around it and stated that he guessed "he blew her brains out." The remark was made spontaneously by him and was not in response to any question. The defendant had a strong odor of alcohol on his breath and was cursing. After the officers were there about 45 minutes the defendant was arrested on a public drunk charge.

Detective Puckett testified that he found the body of a white female he identified as Bonnie Skinner in the Chattahoochee River; that he knew it was she because he had seen her driver's license photograph earlier in the day and because he had been told what kind of clothes she was wearing at the time her body was thrown into the river.

One witness testified that Bonnie Skinner worked at a Truck Stop on Highway I-85; that she and the defendant came by the Truck Stop on the night of the homicide sometime between 11:00 p.m. and 2:00 a.m. and that Bonnie was driving the car.

Dennis A. Mills, a Gwinnett County Detective, testified that on September 9th about 7:35 a.m. he received a radio call which initiated his investigation. He went to the home of the defendant where another officer was already present and asked the defendant where his wife was. The defendant told him she was in the house. Officer Mills left the defendant's home and went to the police station where he talked with the defendant's brother, Jack. Officer Mills returned to the defendant's home and made some pictures of the automobile of the deceased which showed bloodstains on the seat, on the floorboard on the right, in the front seat area, and a few bloodstains around the door area on the driver's side. He went to Rogers Bridge in Duluth about 9:00 a.m. and observed bloodstains on the bridge. A search was conducted of the river and the body of Bonnie Skinner was found about 1:00 p.m. that day about 12 feet from the Gwinnett County shore line — the river was 50 feet wide at that point. Earlier in the day at 11:40 a.m., Officer Mills talked with the defendant at the police station. At that time he was placed under arrest for murder. The defendant was advised of his constitutional rights, stated that he understood them and wanted to make a statement. The defendant told the officers that Bonnie Skinner was not actually his

wife but that they had lived together off and on for the last four years; that he was drinking liquor and beer that night, that he, Bonnie and his brother Jack went to a drive-in movie that night and left there about 12:30 a.m.; that he took his brother home; that he and Bonnie went to the Truck Stop; that Bonnie got out of the car, went over in the parking lot and talked to a truck driver; they left the Truck Stop with Bonnie driving the car; that an argument developed over her talking with the truck driver; that she slapped him, that while they were driving down the road, she pulled his gun from underneath the seat on the driver's side, cocked it, and pointed it at him; that he grabbed the gun, twisted it, and it discharged shooting Bonnie; that he stopped the car which ran into a bank; that the car hit the bank and he got her over onto the passenger side of the vehicle; that he drove the car to Rogers Bridge and threw her body into the Chattahoochee River; that he returned home, awakened his brother about 3:15 a.m. and told him what happened; that he asked him to clean the gun; that while he and Jack were riding in the car, he was drinking and "passed out" and after that did not remember much.

The defendant in his unsworn statement to the jury reiterated the statement he had previously given the police officers, except he stated that after they left the Truck Stop, Bonnie started arguing about him "running around on her, so we had a little argument and going on up the road and I started to take a drink of liquor. At the time when I started to take it she sort of slapped me, and I thought everything was fine and all at once she pulled the gun on me, stuck it up in my jaw, cocked it and told me, said if I ever found you was running around on me I would kill you. So at that time she looked back at the road and when she did I grabbed her arm with the intentions of just moving it out of the way. We run out of the road, she lost control of the car,

we went up a bank and at that time, the gun went off." He stated that he threw her body in the river at the bridge.

The medical testimony showed that Bonnie Skinner died as a result of a single large caliber bullet wound just under the right jaw. The wound was a contact wound where the muzzle of the gun was against the tissue when the gun was fired. The victim's head was not in an upright position when the bullet entered it but was in a tilted position, a position not normal for driving. The victim was alive at the time the wound was inflicted, and it was the sole cause of death.

1. The appellant contends that there is no evidence in the record that Bonnie Skinner was in fact killed by the acts of the appellant. The enumerated evidence shows that the appellant said at various times that: "he had blown her head off," that he had accidentally shot her after she pointed a gun at him, and that he accidentally shot her while they were quarreling.

"To kill by using a deadly weapon in a manner likely to produce death, will raise a presumption of intention to kill." *Moon v. State,* 68 Ga. 687 (7); *Flannigan v. State,* 135 Ga. 221 (4) (69 SE 171); *Plummer v. State,* 200 Ga. 641 (1) (38 SE2d 411); *Carrigan v. State,* 206 Ga. 707 (58 SE2d 407); *Ogletree v. State,* 209 Ga. 413 (3) (73 SE2d 201); *Fisher v. State,* 228 Ga. 100 (2) (184 SE2d 156); *Chandle v. State,* 230 Ga. 574.

The evidence was sufficient to submit to the jury the question of homicide of the deceased. Furthermore, the appellant admitted inflicting the wound which caused her death.

2. The appellant contends that the statement made to the police officers while they were in the yard of his home talking to him was inadmissible because he was not advised of his constitutional rights as required by Miranda v. Arizona, 384 U. S. 436, 473 (86 SC 1602, 16 LE2d 694, 10 ALR3d 974) and Jackson v. Denno, 378 U.

S. 368 (84 SC 1774, 12 LE2d 908, 1 ALR3d 1205). There is no merit in this contention. The decision in Miranda applies to in-custody interrogation. The decision in Jackson v. Denno deals with the voluntariness of a confession and has no application to advising an appellant of his constitutional rights. *Dennis v. State,* 226 Ga. 341 (2) (175 SE2d 17); *Kemp v. State,* 227 Ga. 251 (1) (179 SE2d 920).

3. The appellant contends that the court erred in directing the jury to return a sentence of life imprisonment on the punishment phase of the trial. We do not agree. Life imprisonment was the only lawful sentence which could be returned by the jury in this case for this crime, under U. S. Supreme Court decisions, after finding the defendant guilty. Compare Furman v. Georgia, 408 U. S. 238 (92 SC 2726, 33 LE2d 346); *Sullivan v. State,* 229 Ga. 731 (194 SE2d 410); *Scott v. State,* 230 Ga. 413.

*Judgment affirmed. All the Justices concur.*

ARGUED MAY 15, 1973 — DECIDED MAY 31, 1973 — REHEARING DENIED JUNE 21, 1973.

*Harrison & Garner, G. Hughel Harrison,* for appellant.
*W. Bryant Huff, District Attorney, Gary Davis, Dawson Jackson, Arthur K. Bolton, Attorney General, Courtney Wilder Stanton, Assistant Attorney General, B. Dean Grindle, Jr., Deputy Assistant Attorney General,* for appellee.